# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 6, 2013

No. 12-20716

Lyle W. Cayce
Clerk

ANADARKO PETROLEUM CORPORATION,

Plaintiff - Appellant

v.

WILLIAMS ALASKA PETROLEUM, INCORPORATED,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, HAYNES, and GRAVES, Circuit Judges.

HAYNES, Circuit Judge:

Anadarko Petroleum ("Anadarko") appealed the district court's grant of summary judgment in favor of Williams Alaska Petroleum ("Williams Alaska") in this breach-of-contract action. Williams Alaska's petition for rehearing is DENIED and the following opinion is substituted in place of our prior opinion.

Anadarko argues that Williams Alaska ignored the parties' agreements to pass through shipping credits on purchased oil, denying it more than $9 million due under the contract. In light of the agreements, we REVERSE and RENDER judgment in favor of Anadarko for the amount of the credit, and REMAND for a determination of interest and attorney's fees.

No. 12-20716

**I.**

Anadarko produces crude oil on the Alaskan North Slope, and Williams Alaska operates a refinery in Alaska near the Trans Alaska Pipeline System ("TAPS"). The two parties entered into two purchase agreements in 2000 and 2001, under which Anadarko agreed to sell crude oil to Williams Alaska. The first agreement became effective on September 1, 2000, and expired pursuant to its own terms on November 30, 2001. The second purchase agreement was executed and became effective on December 1, 2001. Anadarko terminated the second agreement pursuant to a termination agreement, signed on September 25, 2002, and becoming effective on December 31, 2002.

Under both agreements, the parties tied the contract price for crude oil to several factors, including an independent quality assessment performed by the TAPS Quality Bank.[1] The TAPS Quality Bank is a third-party accounting arrangement designed to ensure that pipeline users are appropriately compensated for the value of the crude oil they ship through the common-carrier pipeline. The Quality Bank is a "zero sum" operation: shippers of lower-quality crude oil pay into the Quality Bank, while shippers of higher-quality crude oil receive payments from the Quality Bank. Both are known as "Quality Bank adjustments."

During the contractual relationship, the exact amounts of the prevailing Quality Bank adjustments were not known at the time Anadarko invoiced Williams Alaska for the crude oil delivered the prior month. Anadarko derived

---

[1] The contract pricing provision reads:

Price will be the average of [an index price for crude oil] less the following amounts[:] . . . Quality Bank payments required for the shipment of Alpine crude oil from the inlet of the Alpine Pipeline to Pump Station #1 on TAPS. *If Quality Bank for Alpine crude oil is a credit, Price will be increased by the amount of the credit.* Price will not be adjusted for any Quality Bank payments or credits downstream of Pump Station #1 on TAPS.

(emphasis added).

No. 12-20716

the contract price using the other known factors and by estimating the amounts for the Quality Bank adjustments. The parties would then "true-up" the price, or bring it to the correct balance, the following month based on the actual Quality Bank credits or debits received by Williams Alaska.

Several years after the termination of the contracts, the Federal Energy Regulatory Commission ("FERC") determined that the methodology for assessing the quality of oil entering the pipeline was inaccurate. FERC changed the methodology and applied the change retroactively to February 1, 2000. The new methodology resulted in a substantial credit—over 9 million dollars—issued to Williams Alaska by the Quality Bank, based on the crude oil that was produced by Anadarko and sold under the agreements.

## II.

We review a grant of summary judgment de novo, applying the same standard as the district court. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Contract interpretation, including the question of whether a contract is ambiguous, is a question of law subject to de novo review. *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 428 (5th Cir. 2003).

## III.

The district court interpreted the contractual language and concluded that the agreements called for "contemporaneous" payments and thus did not entitle Anadarko to the later-determined Quality Bank credits.[2] The pricing provision

---

[2] Alternatively, the district court also concluded that Williams Alaska's receipt of adjustments from the Quality Bank was a condition precedent to its duty to pay any credit to Anadarko under the agreement, and that condition did not arise prior to the contract's termination. We disagree. A condition precedent is an event that must be performed before a right can accrue to enforce an obligation. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex.

states that "if Quality Bank for Alpine crude oil is a credit, Price will be increased by the amount of the credit." The payment provision in the Agreements provided that: "Payment will be made by wire transfer of immediately available funds on or before the 20th day of the month following the month of delivery."

A contract for the sale of oil is a contract for the sale of goods under the Texas Uniform Commercial Code ("U.C.C."). TEX. BUS. & COM. CODE § 2.107(a) (West 2009); *Fletcher v. Ricks Exploration*, 905 F.2d 890, 892 (5th Cir. 1990); *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 577 (Tex. 1996) (Phillips, C.J., concurring in part and dissenting in part). Although the terms of a written agreement may not be contradicted by contemporaneous or antecedent evidence, terms may be explained by course of dealing or course of performance. TEX. BUS. & COM. CODE §§ 1.205; 1.303(a), (d), & (e) (formerly codified at TEX. BUS. & COM. CODE § 2.208 (repealed 2003)); 2.202.

On petition for rehearing, Williams Alaska argues that this court erred in failing to make a "requisite determination under the [U.C.C.] that the parties' agreements were *ambiguous*." Counsel misleadingly cites comment 1(c) to § 2.202 for the proposition that "a condition precedent to the admissibility of [course-of-performance evidence] . . . is an original determination by the court that the language used [in a contract] is ambiguous." TEX. BUS. & COM. CODE § 2.202 cmt. 1. When the comment is read in full, it is quite clear that the *opposite* proposition is true as the predicate section to all three subparts,

---

1992). Although the provision "[i]f Quality Bank for Alpine crude oil is a credit, Price will be increased by the amount of the credit" uses conditional language, it does not create a condition precedent to Williams Alaska's ultimate obligation to pay Anadarko the contract price for the crude oil delivered. Here, the "if" term is meant to differentiate the situation where the Quality Bank instead assessed a payment because the value of the crude oil delivered was less than the common stream. The obligation to pass through Quality Bank credits attached to Anadarko's tender of the crude oil, and the wording does not speak to *when* the credits are given.

No. 12-20716

including subpart(c), is as follows: "This section *definitely rejects*" the arguments that follow it, namely Williams Alaska's contention that we may not consider course-of-performance evidence absent an ambiguity finding. TEX. BUS. & COM. CODE § 2.202 cmt. 1 (emphasis added). Indeed, comment 2 notes that "the course of actual performance by the parties is considered the best indication of what they intended the writing to mean," because, "[u]nless carefully negated," the course of performance has "become an element of the meaning of the words used." TEX. BUS. & COM. CODE § 2.202 cmt. 2.[3]

Construing the effect of the agreements in light of the contract and the parties' course of performance, we conclude that the judgment for Williams Alaska cannot stand. While the payment provision providing for payment by the twentieth day of the month indicates the parties' intent that Williams Alaska's monthly payments should be made on a timely basis, that is the extent of its reach. Nothing in this provision—or in the remainder of the agreements—indicates that if Williams Alaska's payments were later determined to be inaccurate, the parties would let the error stand. Furthermore, the plain language of the price provision clearly states that if Quality Bank adjustments are a credit, "Price will be increased by the amount of the credit."

---

[3] Williams Alaska further cites Texas case law to support its position that this court is required to find the contract ambiguous before considering course-of-performance evidence. Some of the cited cases, addressing non-U.C.C. contracts, plainly do not apply. *See Twittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (royalty dispute over oil and gas lease); *Nat'l Union Fire Ins. Co. Of Pittsburg v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (insurance contract); *Corso v. Carr*, 634 S.W.2d 804, 808 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) (construction contract). Of the cases cited to that do apply the U.C.C., none require a finding of ambiguity before course of performance may be considered. For example, *Frost National Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310 (Tex. 2005), merely noted in a footnote that "[b]ecause the plain language of the contract is clear and supports Frost's interpretation, we need not consider such [course-of-performance] evidence for explanatory purposes." *Id.* at 313 n.3; *see also James L. Gang & Assocs., Inc. v. Abbott Labs, Inc.*, 198 S.W.3d 434, 437–38 (Tex. App.—Dallas 2006, no pet.) (addressing course-of-dealing evidence); *Atl. Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777, 783–84 (Tex. App.—Houston [14th Dist.] 1989, no writ) (discussing supplementation or explanation by usage of trade under § 2.202). These cases do not support Williams Alaska's interpretation of the law.

5

No. 12-20716

The price provision contains no encumbering terms to indicate that there is a time limitation on Williams Alaska's obligation to pay following receipt of the credit.

Moreover, the undisputed evidence shows that the parties' course of performance indicates that they consistently made adjustments to the amount of payment due at a time after the contract payment date, in order to "true-up" the actual Quality Bank adjustments from the estimated amounts. We construe the express terms of an agreement, where reasonable, to be consistent with the applicable course of performance. *See* TEX. BUS. & COM. CODE §§ 1.303(e), 2.202. While the parties were not confronted with FERC-ordered retroactive Quality Bank adjustments, their course of performance shows that through their "true-up" arrangement, they did not treat the payment provision's monthly schedule as conclusive on Williams Alaska's obligation to pay the final, correct purchase price. Accordingly, the agreements require Williams Alaska to remit any Quality Bank credits it receives for the crude oil purchased under the contract.

We further reject Williams Alaska's contention that the obligation to remit the credits expired upon the termination of the agreement. When a contract terminates, "all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." TEX. BUS. & COM. CODE § 2.106(c). An obligation is executory on both sides if it is "one that is still unperformed by *both* parties or one with respect to which something still remains to be done on *both* sides." *Lee v. Cherry*, 812 S.W.2d 361, 363 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (emphasis in original) (internal quotation marks omitted). Anadarko gave notice under the terms of the agreements that the contract would not renew as of January 1, 2003. Effectively, Anadarko no longer promised to sell crude oil to Williams Alaska, and Williams Alaska was not obligated to purchase oil after that date. Williams Alaska's obligation to remit Quality Bank credits, however, is tied to Anadarko's

6

prior tender of the crude oil. This is again evidenced by the parties' conduct: Williams Alaska made "true-up" payments in early 2003, after termination, based on crude oil sold in the months prior. Thus, we conclude that where Anadarko has already discharged its full performance under the contract by tendering the oil, Williams Alaska's obligation to pay the correct contract price, including the Quality Bank credits, is no longer executory and thus survives the contract's termination.

Williams Alaska argues that Anadarko is barred by the statute of limitations. A four-year period applies to actions based upon breach-of-contract claims for the sale of goods. TEX. BUS. & COM. CODE § 2.725(a). "A cause of action accrues when the breach occurs[.]" *Id.* § 2.725(b). Because the contract's price provision required Williams Alaska to account to Anadarko for Quality Bank adjustments on the purchased oil, Williams Alaska did not breach this provision of the contract until it received the Quality Bank adjustments *and* failed to remit them. The contract thus was breached in August 2007. As Anadarko filed suit in March 2011, it was brought within the four-year statute of limitations and is not time-barred.

Finally, we conclude that Anadarko is entitled to interest on the unpaid Quality Bank credits from the time of breach. The contract expressly provided for the accrual of interest for any payment not made when due.[4] Contrary to Williams Alaska's contention, Anadarko was not required to issue an invoice to trigger the running of prejudgment interest. Indeed, as we discussed above,

---

[4] Paragraph F of the General Provisions incorporated into the agreements provides that: "In the event that [Williams Alaska] fails to make any payment when due, [Anadarko] shall have the right to charge interest on the amount of the overdue payment at a per annum rate which shall be two percentage points higher than the published prime lending rate of Morgan Guaranty Trust Company of New York on the date payment was due, but not to exceed the maximum rate permitted by law." The "published prime lending rate" of the successor in interest to Morgan Guaranty Trust Company was 8.25% on August 20, 2007, making the prejudgment interest rate applicable here 10.25%.

there was no contractual precondition on Williams Alaska's obligation to pay the contract price, other than Anadarko's tender of the oil. Therefore, Williams Alaska's failure to remit the credits was a "fail[ure] to make any payment when due" under the agreements, and Anadarko is entitled to charge interest on this amount from the time of the breach in August 2007. Further, as the prevailing party in a breach-of-contract action, Anadarko is entitled to attorney's fees under Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(8).

Based on the foregoing discussion, we REVERSE and RENDER judgment in favor of Anadarko for the amount of the credit, and REMAND to the district court to calculate the interest and determine attorney's fees owed to Anadarko, and any other proceedings consistent with this opinion.